# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BETTYE A. LOVING,

        Plaintiff,

    v.                          Case No. 08-C-881

TIMOTHY GEITHNER, SECRETARY,
UNITED STATES DEPARTMENT OF
THE TREASURY,

        Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

## I.  PROCEDURAL BACKGROUND

This action was commenced on October 17, 2008, when the plaintiff, Bettye A. Loving ("Loving"), filed a complaint in the United States District Court for the Eastern District of Wisconsin pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, against the defendant, Timothy Geithner, acting as Secretary for the United States Department of the Treasury. In her Amended Complaint, Loving claims that her supervisors subjected her to a hostile work environment, discriminated against her because of her race, retaliated against her for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and for complaining of harassment/discrimination, and unlawfully terminated her.

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1346, and venue is proper in the Eastern District of Wisconsin pursuant to 42 U.S.C. § 2000e-5(f)(3).  All parties have consented to the exercise of jurisdiction by a magistrate judge.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

This matter is now before the court on the defendant's motion for summary judgment, which was filed on July 30, 2010. After being granted numerous extensions of time to file her response, Loving filed a response on February 7, 2011. However, on February 7, 2011, Loving also filed a motion to supplement her response with additional exhibits, which this court granted on February 14, 2011. In the court's February 14, 2011 Order, the court also ordered Loving to file "any and all materials in opposition to the defendant's motion for summary judgment" no later than February 28, 2011. Thus, on February 28, 2011, Loving filed not only additional exhibits, but also a "Corrected Copy of Proposed Findings of Fact," "Additional Supplement to Proposed Findings of Facts and Exhibits," "corrections and exhibits to the response to the defendant's Proposed Findings of [F]acts," "a copy of exhibits that were either omitted or a new exhibit to be associated with the original exhibits of the Proposed Findings of Fact," and a "Response (Supplement) Brief to Defendant's Motion for Summary Judgment." The defendant filed his reply on March 18, 2011, concluding the briefing on his motion. For the reasons that follow, the defendant's motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

Loving was employed by the IRS for a little more than twenty years. However, in February 2007, the IRS fired Loving, citing attendance, unsatisfactory performance, and unprofessional/disrespectful conduct reasons. Loving was notified of her proposed removal from IRS service by letter dated January 10, 2007, which noted thirty-two "specifications" giving rise to her termination. (Ex. 1007.) This letter was signed by Ronald Rossi ("Rossi"), Loving's Territory Manager. On or about February 15, 2007, David Horton ("Horton"), the "Director, Field Operations, LMSB, Heavy Manufacturing & Transportation," issued a letter of final decision removing Loving from governmental service, with the effective date of February 17, 2007. (Def.'s Proposed Findings

of Fact ("DPFOF") ¶¶ 17-18.) Loving appealed her termination to the Merit Systems Protection Board ("MSPB"), alleging that her removal was based upon race discrimination and retaliation. Administrative Judge Stephen E. Manrose held hearings on December 10, 2007 and February 11 and 12, 2008, after which the MSPB affirmed Loving's removal.

At the time of her termination from the IRS, Loving's title was Management and Program Assistant, General Schedule ("GS" or "Grade"), with the Department of Treasury, Internal Revenue Service ("IRS"). However, it appears that Loving served in this capacity in title only. (DPFOF ¶ 418.) The Territory Manager's position for which Loving assisted was abolished in 2002, and there was thus "no need for a Management Assistant to the Territory Manager in the Waukesha POD." (Ex. 1161 at 3.) Because the territory manager's position for which she assisted as a Management Assistant was abolished, Loving's responsibilities as a Management Assistant were likewise abolished, although she remained a Grade 7 employee. Instead, Loving performed the duties of a Group Secretary, and she worked for various team leaders for approximately four years.

Issues pertinent to the present case began to arise when Loving was assigned to Cynthia Fox's ("Fox") team. In October 2005, Fox served as a "Team Manager" for one of the four "Large and Mid Size Business" ("LMSB") components in the agency's Pewaukee, Wisconsin office. As a LMSB Team Manager, Fox supervised GS-13 and GS-14 Senior Revenue Agents, who acted as "team coordinators" in connection with audits of tax returns of applicable corporations and businesses. Beginning on October 1, 2005, Loving was assigned to Fox's group as the Group Secretary. As Group Secretary, Loving's duties included managing information and computer systems for cases that were assigned to the group, mail handling duties involving the group, taking notes during group meetings, and assisting revenue agents. (DPFOF ¶ 7.)

By a memorandum dated November 2, 2005, Loving apprised Fox that she wished any communication between them to be done by electronic mail.  Specifically, Loving stated as follows:

> In light of what happened on September 21, 2005 [alleged physical harassment incident] I think it is only reasonable that any contact between us be done by e-mail as my attorney has advised me.  If it is absolutely necessary for me to meet with you, prior notice is being requested for any meetings.  My attorney has requested to be physically present or by telephone due to your confrontational behavior and to have someone of my choice advising me of my employment rights.

(Ex. 3007.)  Pursuant to Loving's request, it appears that the majority of further communications and/or contact between Loving and Fox occurred via e-mail.

In approximately June 2006, Loving filed an EEO complaint against Fox and Rossi.  Loving supplemented this EEO complaint several times up through December 2006.  Fox testified that she learned of Loving's EEO complaint on or about July 17, 2006, when she was asked to sign an affidavit regarding Loving's claim.  (DPFOF ¶¶ 391, 393.)  In neither her original response to the defendant's proposed findings of fact nor in her amended response to the defendant's proposed findings of fact filed on February 28, 2011, does Loving dispute that Fox learned of her EEO complaint on or about July 17, 2006.  Therefore, such proposed fact will be deemed admitted.

As previously stated, Loving's removal from the IRS was predicated on thirty-two "specifications."  Loving challenges all of these listed specifications.[1]  Instead, Loving maintains that the defendant had planned to remove her from the beginning, and thus, Fox assigned tasks to her in an effort to justify Loving's counseling memoranda, of which she received twenty-eight.  She indicates that the defendant concocted a special leave policy that applied to only her.  According to Loving, Fox unfairly charged her as absent without leave ("AWOL").  The tasks to which she was

---

[1]  If and when it becomes necessary to explore any of these specifications, the court will undertake that task.  Suffice it to say, the parties present lengthy and differing views on the legitimacy of those specifications.

assigned were sometimes menial, sometimes impossible to complete, and sometimes accompanied by unreasonable deadlines. Loving contends that Fox's e-mails to her were harassing and retaliatory. Loving also indicates that of the ten employees in Fox's team, Loving was the only African American, no one else filed EEO complaints, and all of the other employees Fox supervised were treated more favorably than she.

### III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

## IV. DISCUSSION

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Loving contends that she was discriminated against in violation of Title VII based on her race, which is African American. Loving makes four interrelated arguments: (1) that she was subjected to a hostile work environment; (2) that she was discriminated against; (3) that she was retaliated against for filing EEO charges and for complaining about discrimination; and (4) that she was unlawfully terminated based on her race. The court notes that Loving's claims are interrelated because Loving contends that she was harassed, discriminated against, and terminated because of her race. Loving also contends that the ways in which the defendant retaliated against her were to subject her to a hostile work environment, to discriminate against her, and ultimately, to cause her termination.

## A. Hostile Work Environment

Loving claims that she was subjected to a hostile work environment during Fox's tenure as her supervisor. To survive the defendant's summary judgment motion on this claim, Loving must demonstrate that (1) her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). To determine whether a working environment is "hostile," courts may consider "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

Loving contends that she was subjected to a hostile work environment because Fox was consistently bombarding her with menial and impossible tasks, some of which were accompanied with unreasonable deadlines. Loving argues that Fox enacted an annual and sick leave policy that applied to only her, that Fox was confrontational towards her, that Fox failed to issue Loving an annual appraisal in July 2006, that Fox inappropriately charged her with AWOL hours, and that Fox manufactured allegations against Loving in an attempt to make her appear insubordinate. Further, Loving states that Fox put Loving's EEO matters and counseling memoranda on her Outlook calendar for other employees to see. According to Loving, Fox's treatment of her was condescending, disrespectful, demeaning, and humiliating.

Although "a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute a racial 'character or purpose' to it." *Vance*, 646 F.3d at 470 (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999)); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Despite Loving's

numerous allegations, Loving has failed to establish that Fox's conduct had a racial "character or purpose." Drawing all inferences in Loving's favor, Loving paints a picture of a difficult work life. Although the record demonstrates that the *relationship* between Fox and Loving may have been hostile, there is no evidence demonstrating that Fox's conduct was motivated by Loving's race. The evidence shows only that Loving and Fox did not get along, creating an environment that was, however distressing, not "hostile."

To be sure, Loving was the only African American in Fox's group. There is no evidence demonstrating that any other employee under Fox's supervision was treated in the same fashion as Loving. However, Loving's lack of proof as to racial animus is evidenced by her own proposed findings of fact. Other than stating that she is an African American, that the defendant knew of her race, and that she prevailed in an EEO complaint involving race discrimination against the defendant in 1995, Loving makes no further references to her race. More importantly, in her proposed findings of fact and her "Additional Supplement to Proposed Findings of Facts," which together span in excess of fifty pages, there is no mention of any acts of which Loving complains being taken (by anyone) because of her race. Further, Loving points to no evidence, particularly no oral or written communications, indicating that Fox bore ill will towards her because of her race. Most of Fox's and Loving's communications occurred via e-mail based upon Loving's November 2, 2005 request. (*See* Ex. 3007.) Loving has not directed this court's attention to any particular e-mail from Fox that led her to believe that Fox's conduct towards her was motivated by Loving's race. Nor did any other employee report to Loving that Fox uttered racially derogatory comments. To be sure, Loving complained that "her co-workers were saying she was a 'Slave' for Ms. Fox." (Pl.'s Corrected Copy of Proposed Findings of Fact ("CCPFOF") ¶ 192.) However, not only does Loving fail to support this proposition with a proper record citation (contrary to Fed. R. Civ. P. 56(c)(1)), but such evidence is

hearsay if Loving is offering such information to prove that, in fact, she was a "slave" to Fox. While such evidence will be stricken on these grounds, even if it were to be considered for purposes of summary judgment, it still falls short of demonstrating racially motivated conduct on Fox's part because such words were not uttered by Fox.[2]

To the extent that Loving is claiming that Rossi assisted in creating a hostile work environment—and it is not clear that she is—her claim also fails. The evidence she has against Rossi with respect to his underlying motivations is even more sparse than her evidence against Fox. There is simply no evidence from which to infer that Rossi's conduct in any way created a hostile work environment for Loving.

Simply put, Loving has offered no evidence to permit a reasonable jury to find that Loving was harassed based on her race. Accordingly, the defendant's motion for summary judgment with respect to Loving's hostile work environment claim will be granted.

## B. Discrimination

Loving also claims that the defendant discriminated against her because of her race. To prevail at the summary judgment stage on her race discrimination claim under Title VII, Loving must demonstrate the defendant's discriminatory intent under either the "direct" or "indirect" method of proof. *See Silverman v. Board of Educ. of the City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011).

---

[2] In an e-mail dated November 6, 2006 and addressed to Fox, Loving stated that "when two Caucasian employees and one African American employee were at my desk laughing, you verbally mentioned this behavior to the African American employee but you did not talk to the two Caucasian employees who were standing with her at my desk talking." (Ex. 1152.) This evidence also falls short of demonstrating actions taken against *Loving* because of her race. First, it is unclear from Loving's email whether Fox "verbally mentioned this behavior" to her. Second, Loving does not indicate how she came to know this, that is, that such information was based on her personal knowledge. Finally, there are no details about the incident, or about what Fox "verbally mentioned" to this other African American. For these reasons, this e-mail does not permit any inference that Fox's conduct towards Loving was racially motivated.

A plaintiff proceeding under the direct method of proof may rely on two types of evidence: direct evidence or circumstantial evidence. *See id.* Direct evidence is evidence "that would prove the fact in question—the discriminatory intent—without reliance on inference or presumption." *Id.* at 733-34 (citing *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003)). In other words, direct evidence is evidence that may "'be interpreted as an acknowledgment of discriminatory intent by the defendant.'" *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (quoting *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Simply stated, "[d]irect evidence 'essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus.'" *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000)).

A plaintiff may also prevail under the direct method of proof by establishing a "convincing mosaic" of circumstantial evidence that "would allow a jury to *infer* intentional discrimination by the decision-maker." *Silverman*, 637 F.3d at 734. Circumstantial evidence "may come in the form of 'suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group.'" *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 736). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

A plaintiff proceeding under the indirect method of proof, as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must generally show that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated individuals who are not members of a protected class. *See Ineichen v. Ameritech*, 410 F.3d 956, 959

(7th Cir. 2005). "The failure to establish any one of the initial four elements [of a prima facie case] defeats a discrimination claim." *Bio v. Federal Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005).

If the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *McDonnell Douglas*, 411 U.S. at 802. Then, if the defendant articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Ineichen*, 410 F.3d at 961. Pretext requires more than a showing that the decision was "mistaken, ill considered or foolish . . . so long as [the employer] honestly believe[s] [in the reason presented], pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). "Pretext means a dishonest explanation, a lie rather than an oddity or an error,'" *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)), or "'deceit used to cover one's tracks,'" *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir.2001) (citing *Kulumani*, 224 F.3d at 684).

In this case, it is unclear under which method of proof Loving is proceeding. However, it is clear that she has not presented any evidence establishing discriminatory intent via the direct method of proof. For the reasons stated above, there is no direct evidence establishing that either Fox or Rossi acted because of any impermissible animus. Neither Fox nor Rossi admitted that their actions were motivated by discriminatory reasons. Further, there is no evidence from which a rational jury could interpret an acknowledgment of discriminatory intent by Fox or Rossi.

Likewise, there is no evidence in the record from which a jury could *infer* intentional discrimination by Fox or Rossi. Just as direct evidence must lead to the inescapable conclusion that the defendant acted based on an impermissible animus, so too must circumstantial evidence point to a discriminatory reason for the employer's actions. Loving has not presented any discriminatory

reason for the way that Fox treated her. Certainly, a jury could infer that Fox and Loving were not particularly fond of one another. But, that is the most that a jury could infer from the evidence. Assuming that the actions of which Loving complains constitute adverse actions, the evidence simply does not permit any inference that such actions were the result of intentional racial discrimination.

However, Loving can still defeat the defendant's summary judgment motion on her discrimination claim if she can establish a prima facie case of discrimination by way of the indirect method of proof. Here, the parties do not dispute that Loving is a member of a protected class and that she has suffered at least one adverse employment action, that being termination. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) (finding termination to be an adverse action).[3] There is no question that Loving did not meet the defendant's expectations. However, Loving disputes the legitimacy of these expectations. Whether Loving has presented evidence creating a triable issue of fact on this element needs not be addressed, however. This is because Loving fails to demonstrate one important element of her prima facie case: whether similarly situated Caucasian employees were treated more favorably than she.

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). The "similarly situated" prong serves to eliminate other possible explanatory variables, "such as differing roles, performance histories, or decision-

---

[3] Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). Loving has not presented evidence establishing adverse action under the second category. Whether Loving suffered unbearable changes in job conditions is disputed, but need not be addressed for purposes of the discrimination analysis because she has already established adverse action by way of termination.

making personnel, which helps to isolate the critical independent variable"—discriminatory animus. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Whether a comparator is similarly situated is "usually a question for the fact-finder," and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009).

A plaintiff must show that similarly situated employees were "comparable to the plaintiff in all *material* respects." *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006).

> The similarly situated inquiry is a flexible, common-sense comparison based on 'substantial similarity' rather than a strict 'one-to-one mapping between employees,' but still requires 'enough common features between the individuals to allow [for] a meaningful comparison.' A meaningful comparison is one which serves 'to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps to isolate the critical independent variable: complaints about discrimination.'

*Argyropoulos*, 539 F.3d at 735 (quoting *Humphries*, 474 F.3d at 405). Thus, to evaluate whether two employees are directly comparable, courts consider all of the relevant factors, which most often include whether the employees "(I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision.'" *Abuelyaman v. Ill. State Univ.*, No. 10-2926, 2011 U.S. App. LEXIS 24616, at *25 (7th Cir. Dec. 13, 2011) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).[4] Importantly, "courts do not sit as super personnel departments, second-guessing an

---

[4] In a recent case before the Seventh Circuit, the court stated that "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, No. 10-3694, 2012 U.S. App. LEXIS 241, at *19 (7th Cir. Jan. 6, 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

employer's facially legitimate business decisions." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 693 (7th Cir. 2005).

Loving contends that she was similarly situated to two other IRS employees.[5] In pertinent part, Loving states as follows:

> The evidence establishes that there were two Audit Aides, GS-6 who performed group secretary duties and for Ms. Fox as well. One who had filed an EEO complaint, and were[] treated more favorably. Ms. Fox and Mr. Rossi in preparation of their affidavits they stated on almost every allegation that there were no "similarly situated" employee in his or her group or territory. They interpreted their behavior to be ok because there was no other Management Assistant in the territory, therefore, their conduct could not be discriminatory. Acting group secretaries, both performed group secretarial duties for Ms. Fox, but were never assigned to Ms. Fox like Ms. Loving, their critical elements were not changed; they were not treated by Ms. Fox the same as she treated Ms. Loving. Ms. Loving was required to perform mail duties, answer the doorbell for visitors, as a Management Assistant, Ms. Loving was required to perform IDRS work, which is prohibited under her job Managment Assistant position description, Ms. Loving's time records are reported to Mr. Rossi's office and Managment Assistant and not the other group secretaries or audit aides, denied leave, charged AWOL, given 28 counseling memos, hundreds of harassing e-mails, denied others to assist and/or asked questions regarding any work issue, and in an e-mail, the plaintiff was assigned the responsibility of ensuring that there were backup supplies, including toner, for the facsimile, copy, printer machines, in the Large and Mid-Size, Business Division area in the Waukesha, Wisconsin office of the Internal Revenue Service. The defendant once admitted that Ms. Loving was the only individual assigned these responsibilities. Ms. Loving was the only person who had a specialized leave policy that only applied to her as a group secretary and not the others who were acting as group secretaries; Ms. Loving was not allowed to flex (work at home) like the audit aides who were performing group secretaries duties; not allowed to work credit hours without prior approval.

(Pl.'s Resp. (Supplement) Br. 4-5.) From what can be gleaned from Loving's submissions, she fails to identify the two individuals that were similarly situated to her, but treated more favorably than she.[6]

---

[5] Loving proposes no facts to support her contention that there were employees who were similarly situated. However, as will be discussed, the evidence demonstrates that Loving was not similarly situated to any other employee.

[6] Loving, in her appeal before the United States of America Merit Systems Protection Board, alleged that there were three employees who were similarly situated to her but treated more favorably: Darlene Wright, Rebecca Harrison, and Gina Sutton. (Ex. 1016 at 13.) The Administrative Judge

At the time of Loving's termination from the IRS, Loving's title was Management and Program Assistant. However, it appears that Loving served in this capacity in title only, thereby remaining a Grade 7 employee. (DPFOF ¶ 418.) Because the territory manager's position for which she assisted as a Management Assistant was abolished, Loving's responsibilities as a Management Assistant were likewise abolished. Instead, Loving performed the duties of a Group Secretary. This was the case for approximately four years. Since October 1, 2005, of the approximate ten employees Fox supervised, Loving was the only Group Secretary.

For purposes of the similarly situated analysis, the Seventh Circuit has recently reiterated that a "'difference in job title alone is not dispositive.'" *Coleman*, No. 10-3694, 2012 U.S. App. LEXIS 241, at *24 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)). "The question is not whether the employer classified the comparators in the same way, 'but whether the employer subjected them to different employment policies.'" *Id.* (quoting *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999)). However, in performance cases, such as the present case (as opposed to misconduct cases), a "would-be comparator's professional role may be so different from the plaintiff's as to 'render the comparison effectively useless.'" *Id.* (quoting *Humphries*, 474 F.3d at 405).

It is at this juncture that the parties have differing opinions. Loving, on the one hand, steadfastly maintains that she performed her job according to the legitimate and reasonable expectations of her employer. According to Loving, the tasks for which she was written up include tasks that were menial, impossible to complete, and contrived, giving her employer a basis (albeit a false basis) to both counsel and discipline her. Moreover, Loving complains that Fox applied a

---

Stephen E. Manrose found that Loving "presented virtually no information about the alleged comparators," and that there was no information demonstrating that the alleged comparators engaged in similar misconduct or had past disciplinary histories. (Ex. 1016 at 14.)

specialized leave policy to only her and not to any other employee, and that Fox failed to issue Loving's annual appraisal. On the other hand, the defendant contends that Loving simply failed to perform the responsibilities of a Group Secretary. According to the defendant, Fox was doing her job in giving tasks to her Group Secretary, and Loving failed to perform them in accordance with her employer's legitimate expectations.

Construing the evidence in favor of Loving, as this court is required to do at this stage of the proceedings, a reasonable jury could infer that the defendant treated Loving differently than the other Caucasian employees. There is no evidence suggesting that any other employee was held to a specialized leave policy. There is no evidence of any other employee receiving as many counseling memoranda for comparable workplace violations. There is also no evidence that Fox sent e-mails in the detail and number that she sent to Loving (most likely because Loving requested that her contact with Fox be limited to e-mail only). Simply stated, the evidence suggests that Fox did not treat other employees in the same fashion as she treated Loving.

Despite the evidence demonstrating that Loving was treated differently than other employees, there is not enough information to isolate the critical independent variable, *to wit*, that she was treated differently *because of her race*. First, contemporaneous with Fox becoming Loving's supervisor, Loving requested that her contact with Fox be limited to e-mail. No other employee requested contact with Fox, or even their direct supervisor, to be limited in this fashion. By any comparison, refusing to speak to a direct supervisor other than by e-mail puts a strain on even the best working relationship. Loving's refusal to speak with Fox other than by e-mail puts her in stark contrast to every other employee, who made no such request.

Second, Loving's role within the department was unique. It does not appear from the record evidence that there existed any other employee classified as a Managment Assistant but assigned the

duties of Group Secretary. Moreover, and more importantly, Loving, as a Group Secretary, had different job responsibilities than any other employee. Loving indicates that the two Audit Aides also performed group secretary duties. But, the GS-6 Audit Accounting Aide, and the GS-6 Examination Technician held distinguishable clerical/para-professional roles. The GS-6 Audit Accounting Aide, while she was occasionally given Group Secretary duties, went "out into the field to work with the revenue agents and [was] allowed to flex and . . . ha[d] a laptop computer assigned to her and [could] perform certain assignments at home." (Ex. 1161 at 3.) The GS-6 Examination Technician was a "hybrid group secretary and AAA," was assigned a laptop, was expected to go out into the field, and was allowed to "flex" too. (Ex. 1161 at 3.)

Therefore, the evidence suggests that neither of the two employees to which Loving referred, nor any employee for that matter, (1) held the same job description as Loving and (2) were subject to the same standards. If Loving was subject to different standards than any other employee, which it appears was the case, these different standards could very well account for the different treatment. Further, the nature of Loving's responsibilities—and given that she was the only employee in charge of such responsibilities—explains why Loving was not allowed to flex or work from home. The nature of Loving's responsibilities also speaks to the facial legitimacy of the leave policy governing her employment. Loving was the only clerical assistant in her group and was expected to be in the office during customary business hours. If Loving was absent, replacements had to be found. This court is not in a position to second guess this facially legitimate business decision.

Further, to her detriment, Loving has failed to demonstrate that any employee that she proposes to be similarly situated to her had the same supervisor. The similarly situated requirement "normally entails" the existence of a common supervisor. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). When the same supervisor treats an otherwise equivalent employee better,

one can often reasonably infer that unlawful animus was at play. Because different decisionmakers may "rely on different factors when deciding whether, and how severely, to discipline an employee," the inference of discrimination is much weaker if there exist different decisionmakers. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008).

In this case, the court observes there to be three potential decisionmakers: Fox, Rossi, and Horton. First, with respect to Fox, there is no evidence suggesting that Fox possessed the authority to make employment decisions that affected any one else besides Loving and the revenue agents in Fox's team (and Loving has not shown that she is similarly situated to any revenue agent). Loving argues that there were "two Audit Aid[e]s, GS-6 who performed group secretary duties and for Ms. Fox as well." (Pl.'s Resp. (Supplement) Br. 4.) However, Loving also asserts that "[a]cting group secretaries[] both performed group secretarial duties for Ms. Fox, but were never assigned to Ms. Fox like Ms. Loving, their critical elements were not changed." (Pl.'s Resp. (Supplement) Br. 4.) As Loving herself admits, the employees to which she compares herself were not supervised by Fox.[7]

Nevertheless, it was Rossi who issued Loving a notice of proposed removal, and it was Horton who issued the final decision removing Loving from government service. Thus, although Loving dealt with Fox on a day-to-day basis, it appears that Rossi and Horton were the decisionmakers as to Loving's *termination*. It may very well be that the two employees to which Loving compares herself were subject to decisions made by Rossi and/or Horton. However, even if the court were to grant Loving this inference, there is no evidence that Rossi and Horton were faced with the decision to

---

[7] In fact, Gina Sutton, who appears to be one of Loving's proposed comparators, was under the supervision of Jean Klajbor. (Ex. 3117.)

terminate any other employee's employment.[8]  In other words, their decision to terminate Loving does

not stand to be compared against any decision not to terminate and/or discipline any other employee.

At the end of the day, Loving has not presented sufficient evidence to allow for any

comparison, much less a meaningful comparison.  Loving has not identified the names of any

comparators, their official titles, their assigned duties, or the extent to which they were given group

secretary duties.  Nor has Loving demonstrated what their attendance was, whether they received

counseling memoranda, and if they did, for what kinds of violations.  She also has not indicated to

whom they reported, to whom were they subject to discipline, and whether any other employee

refused to communicate with Fox via face-to-face communication.  These unanswered factors are just

the tip of the iceberg.[9]  Therefore, it is clear that no reasonable jury could find that the similarly

situated requirement has been satisfied, entitling the defendant to summary judgment on Loving's

discrimination claim.

## C. Retaliation

Loving alleges that the defendant retaliated against her for her prior EEO activity and for

complaining about the perceived racial harassment and discrimination to which she was subjected.

The basis for Loving's retaliation claim echoes that which her other claims rest upon.  In particular,

Loving claims that the defendant retaliated against her by issuing her twenty-eight counseling

memoranda, citing performance deficiencies, improper requests for leave, and insubordination;

---

[8]  That is not to say that Rossi and Horton were *never* presented with such decisions (to be sure, they likely faced making termination decisions frequently), it is just that there is no evidence in this case that suggests such to be the case.

[9]  Loving has submitted no information demonstrating whether she had comparable experience, education, or other qualifications to any other employee.  Thus, this factor is a non-starter in the court's analysis, particularly in determining what role this played in her alleged "demotion."

changing her position duties; bombarding her with unnecessary e-mails; charging her as absent without leave; failing to issue her an annual performance appraisal; giving her directives inappropriate for her position at the time; denying her use of "use or lose" leave; making false accusations against her, and terminating her employment.

Like discrimination, retaliation may be established by either the direct or indirect method of proof. Once the employee establishes her *prima facie* case, the burden shifts to the defendant to establish a non-individious reason for the action. The burden then shifts back to the plaintiff to show that the defendant's reason was pretextual. *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009).

To establish retaliation under the direct method of proof, Loving must show that (1) she engaged in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between her protected activity and the adverse employment action. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). There is no question that Loving engaged in protected activity: her EEOC charges were the "most obvious form of statutorily protected activity." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011) (citing 42 U.S.C. § 2000e-3(a)). Additionally, Loving offered evidence indicating that she complained of race discrimination to her superiors as early as September 2005. These informal complaints also constitute protected activity. *See Coleman v. Donahoe*, No. 10-3694, 2012 U.S. App. LEXIS 241, at *62-63 (7th Cir. Jan. 6, 2012).

Without a doubt, Loving's termination was an adverse employment action. As previously discussed, adverse employment actions can also take two other forms. Adverse employment actions for purposes of the federal antidiscrimination statutes may also result (1) from transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects and (2)

from unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). Loving has not offered evidence to establish that the changes in her job duties caused her skills to atrophy, thereby reducing future career prospects. However, it appears that Loving claims that she suffered unbearable changes in job conditions. These alleged changes in job conditions appear to be intricately linked to Loving's termination, and will therefore be addressed accordingly.

Loving's retaliation claim turns on the last element—whether Loving can show causation between her protected activity and the adverse employment action. Loving can show causation by presenting direct evidence, that is, an acknowledgment of discriminatory intent that does not require support from inferences, *see Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005), or by presenting a convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission, *see Treadwell v. Office of Illinois Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006). Because Loving has presented no direct evidence of retaliation, the court turns to whether she has presented circumstantial evidence.[10]

Circumstantial evidence may fall into three categories.

---

[10] According to Loving, Fox retaliated against her by disclosing Loving's EEO complaint on her Outlook calendar, which "a peer manager, the territory manager and the territory manager's management assistant ha[d] access to." (Pl.'s CCPFOF ¶¶ 272-73.) In support of her contention, Loving points to an appointment for July 20, 2006 that Fox accepted on July 19, 2006. The appointment was titled "Copy of EEO Complaints." (Ex. 3111.) Loving also included Fox's calendar for Thursday, August 31, 2006, which shows that her 3:00 p.m. time slot was is occupied with "RE: EEO Issue." There is no indication that these EEO matters were associated with *Loving's* EEO complaint. Further, there is no evidence that any detailed information, including the allegations set forth in the EEO complaint, who was involved in the complaint, or any counseling memoranda cited to in the complaint, were disclosed on Fox's Outlook calendar. Thus, the court finds that these two calendar entries do not rise to the level of retaliation.

One includes "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn." Another is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." Another type is "evidence that the employer offered a pretextual reason for an adverse employment action."

*Coleman*, No. 10-3694, 2012 U.S. App. LEXIS 241, at \*60 (internal citations omitted). "'Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.'" *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

Here, Loving has offered evidence of timing and pretext.[11] First, with respect to timing, the court in *Coleman* reiterated this general rule: "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman*, No. 10-3694, 2012 U.S. App. LEXIS 241, at \*61 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). The *Coleman* court went on to state that

[w]hen temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, "[s]uspicious timing . . . can sometimes raise an inference of a casual connection. . . . Our cases reject any bright-line numeric rule, but when there is corroborating evidence of retaliatory motive, . . . an interval of a few weeks or even months may provide probative evidence of the required causal nexus.

*Id.* at \*61-62 (internal citations omitted). Loving complained of discrimination she allegedly sustained by Fox as early as September 2005, when she also requested that she and Fox communicate by e-mail only.[12] It was in October 2005, a few days after she became Loving's supervisor, that Fox

---

[11] As previously discussed, Loving's evidence about whether she is similarly situated to another employee falls woefully short of the evidence needed to create a triable issue of fact.

[12] In her Amended Complaint, Loving states that she mentioned Rossi and Fox in her EEO complaint and federal court case filed in March 2004, thus implying that their harassment of her began soon thereafter. But, Loving fails to go into depth about what and how any actions Fox and Rossi took against her between March 2004 and September 2005 could possibly have been adverse. Therefore, the point in time that triggered Loving's protected activity for purposes of this case is when she complained to Fox in September 2005 about alleged harassment.

notified Loving via e-mail of the correct procedure for requesting leave. Specifically, Fox instructed as follows:

> Please provide the type of leave being requested and the number of hours. I also am requesting that the requests be provided with enough time for me to respond before the leave is taken. When short time frames are needed, please contact me in person, by phone or cell phone.

(Ex. 1017.) Fox proceeded to advise Loving of her cell phone number.

In the months thereafter, Loving is said to have violated that leave policy numerous times. Although Loving disputes these alleged violations relating to the use of annual and/or sick leave, she has no leg to stand on. First, the reason for the leave policy being instituted was a personnel decision, the legitimacy of which passes muster under this court's scrutiny. Second, it is evident that Loving simply did not follow the policy.[13] Often times, Loving did not contact Fox in person if she requested leave on short notice. If Fox was out of the office, Loving appears to have assumed that she could contact someone else to let them know of her need for leave. Although Loving contests the meaning of "short notice," Loving still did not follow Fox's instruction that she was to contact Fox every time she needed leave, even in the event that Fox was out of the office. The defendant has demonstrated that Fox was available by phone and e-mail when she was out of the office. Perhaps the confusion over whom Loving was to contact in the event Fox was out of the office (assuming Loving was truly confused about whom she was supposed to contact) stemmed from the unenviable situation Loving and her direct supervisor found themselves in, *to wit*, the incapability of them to communicate face-to-face. Simply put, it would be difficult for any reasonable juror to infer that Fox acted with a retaliatory motive in disciplining Fox for attendance issues.

---

[13] This is excluding her absence at the October 19, 2005 group meeting, which was later proven to have been excused.

The heart of Loving's retaliation argument is that the defendant retaliated against her for filing a complaint with the EEOC. (*See* Ex. 1009 at 19 ("'Only' because I filed a discrimination complaint against the IRS and now I have a case pending in Federal Court I have been set up to be fired.").) Loving's EEO activity began in June 2006. By this point in time, a rift had certainly already developed between Loving and Fox. This poor working relationship continued until Loving's termination in February 2007, with the bulk of problems surfacing in late August 2006 and continuing until late November 2006. To be sure, it is evident that (1) Loving, in fact, completed some of the tasks that she was accused of not completing in her letter of proposed adverse action, and (2) for those tasks that she did not complete, she was often unable to complete them.[14] However, the lack of communication channels between Loving and Fox reveal the difficulty in construing these findings in Loving's favor.

For instance, in August 2006, Fox instructed Loving to provide her with an order for ink cartridges. Loving, believing that the proper protocol was to place such order with the Commissioner's Representative (Dale Harper at the time), did just that. At that time, it appears as though the department was transitioning Fox into the Commissioner's Representative role, although e-mails between Fox, Harper, and other supervisors, reveal that the person with whom Loving was to place orders was up for debate. Had Loving not refused to speak to Fox, confusion may have been avoided.[15]

---

[14] In fact, the Appeal Tribunal's Decision, in finding that Loving was not discharged for misconduct, highlights which tasks Loving managed to complete and why she was unable to complete other tasks. (Ex. 3109.)

[15] Loving claims that her reason for limiting her channels of communication with Fox were the result of Fox harassing her on September 21, 2005. However, there is scant evidence of what actually happened during that incident in September 2005. Therefore, no reasonable jury could find that this particular incident constituted harassment and warranted as extreme a demand as no day-to-day communication other than by e-mail.

In September 2006, Fox instructed Loving to process a taxpayer check. Because Loving was not familiar with how to accomplish this, she sought help from other employees. Eventually, Loving was able to process the check; however, she was cited for not bringing her questions and concerns to Fox. Again, had Loving spoken directly with Fox, they could have sorted through the details, consistent with instruction.

In November 2006, Fox instructed Loving to update a taxpayer's case to status code 21. It appears that Loving was unable to update the status code and close the case in the manner Fox had wanted because of the uniqueness of the case. Eventually, an alternative process was agreed upon, and Loving was able to complete the assigned task. However, the confusion regarding how to handle this case manifested itself through e-mail, and it is no surprise that the e-mailing back and forth exponentially increased the difficulty of this task. It is clear that this was not an effective way of working through the issue. If Loving and Fox had been on speaking terms, it is hard not to conclude that Loving could have easily completed such task in a less confrontational and more timely way.

Next, there are the instances in which Loving claims she simply could not have accomplished Fox's assigned tasks. For example, in September 2006, Loving was alleged to have allowed a check to remain in a revenue agent's mailbox from September 11 through September 18, 2006, rather than immediately processing it once it was received. Loving claims that she was not aware that the check was in the revenue agent's mailbox. Loving also claims that this is inconsistent with Fox's testimony that it is the revenue agent's responsibility to process their own checks. (Pl.'s Resp. to DPFOF ¶ 183.)

First, if Loving's responsibility was to process the mail on a daily basis, it is rather doubtful that Loving was not aware of the check's whereabouts. Second, in light of the fact that Loving does not dispute being asked to process a different check on September 12, 2006, which she accomplished with the help of other employees, it seems only logical that, had Loving and Fox had any sort of

working relationship, they could have easily cleared up any confusion about who should be processing checks. (Ex. 1098 at 4.)

The same can be said of another task to which Loving was assigned. On September 15, 2006, Fox instructed her to move materials from one file cabinet to another. However, Loving contends that she was not told of the location of the file cabinet, and that she was unable to locate it. The slew of e-mails between Loving and Fox do not "cut to the chase." Rather, the e-mails are protracted and unnecessarily confusing. This is another matter that could have been easily resolved had Loving entered Fox's office to simply ask where the file cabinet was.

To be sure, timing may be somewhat suspect in Loving's case. Of course, this is because Loving complained of harassment and discrimination throughout her entire tenure as Fox's Group Secretary. But, Loving must show more than a mere nexus between her protected activity and the complained of acts—she must show a *causal* nexus between her protected activity and the defendant's actions. Loving's argument that the actions about which she complains (assuming the court were to construe such action to be "adverse") were causally connected to her protected activity suffers from a fatal flaw: Loving has presented no evidence from which a reasonable jury could infer that Fox or Rossi acted with a retaliatory intent. It is evident that Loving and Fox did not get along even before Fox became Loving's supervisor on October 1, 2005, and before Loving first complained of alleged harassment by Fox. As time passed, Loving's and Fox's relationship substantially deteriorated, and problems between them became more frequent and more contentious. Despite these problems, there is simply no evidence from which to infer that Fox's and Rossi's motive in assigning certain tasks to Loving or in communicating with Loving was retaliatory. Thus, Loving's timing evidence is not particularly probative of the required causal nexus.

Finally, Loving contends that the reasons that eventually led to her dismissal from government service were merely pretextual. In this case, the parties spend an inordinate amount of time arguing about the legitimacy of the reasons for Loving's termination. But, at the end of the day, Loving has not produced evidence to show that the explanation for her termination was dishonest or deceitful.[16] By now, it should be clear that Loving's and Fox's method of communication was, at best, inefficient, and, at worst, a further source of conflict. This situation presents a spot-on example about how electronic communication can breed confusion, not only about tasks to be accomplished, but also about the mind set of the individual delivering the message as well as the mind set of the individual receiving the message. Moreover, it must not be forgotten that Loving was also terminated for sending unprofessional and/or disrespectful e-mails to Fox. After reviewing said e-mails, the court cannot disagree with that characterization. Undoubtedly, the explanation for a few of the instances giving rise to discipline could be called into question. But, Loving must present more evidence than merely showing that certain decisions resulted from mistake or ill-consideration. *See Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for forbidden reason, these errors (more properly, differences in assessment) do not matter."). She has not done so. Therefore, construed as a whole, the defendant's motivations for terminating Loving are beyond reasonable dispute.

In the end, Loving's evidence of suspicious timing and pretext is not enough, either on their own or together, to show a causal connection between her protected activities and her termination.

---

[16] Loving briefly complains of the unreasonable deadlines Fox imposed on her. But, it appears that this occurred only because Fox had to request Loving's assistance numerous times, finally giving Loving a more impending deadline.

Finally, to establish retaliation under the indirect method, Loving must show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; (3) she was performing her job satisfactorily; and (4) she was treated less favorably than a similarly situated employee who did not complain of discrimination. *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009) (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008)). Again, Loving has satisfied the first two elements of proving retaliation under the direct method of proof. However, for the reasons previously discussed, Loving has failed to show that she was similarly situated to any other employee. Thus, she cannot prevail on her retaliation claim under the indirect method of proof. Accordingly, the defendant's motion for summary judgment with respect to Loving's retaliation claim will be granted.

## V. CONCLUSION AND ORDER

Loving has failed to create a triable issue of fact with respect to any of her claims. She has not presented evidence from which a reasonable juror could conclude (1) that either Fox or Rossi harassed her because of her race; (2) that Fox or Rossi acted with any impermissible animus; (3) that she was similarly situated to an employee not in her protected class; or (4) that she was retaliated against for engaging in protected Title VII activity. For the reasons that Loving has not created a triable issue of fact with respect to her hostile work environment, discrimination, and retaliation claims, and because her claim for unlawful termination is predicated upon the same allegations, Loving's unlawful termination claim also fails.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is dismissed;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this <u>31st</u> day of January 2012 at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge